752 F.2d 256
 118 L.R.R.M. (BNA) 2520, 6 Employee Benefits Ca 1299
 UNITED STEELWORKERS OF AMERICA, AFL-CIO-CLC; Richard Rupp;
Newton Plunkett; and Joseph Carr, Plaintiffs-Appellants,
v.
NORTH BEND TERMINAL CO.; Claude Crowley; R.E. France;
J.M. Pheniclie; P. Hellhausen; S. Huey; and L.
Meyers, Defendants-Appellees.
 No. 83-3810.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 25, 1984.
Decided Jan. 21, 1985.
 
 James B. Robinson, Cincinnati, Ohio, Daniel P. McIntyre (argued), Pittsburg, Pa., for plaintiffs-appellants.
 Robert J. Hollingsworth, Cincinnati, Ohio, Mark G. Arnold (argued), Michael J. Bobroff, Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., for defendants-appellees.
 Before EDWARDS and MARTIN, Circuit Judges, and PECK, Senior Circuit Judge.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 This is an action to determine the amount of pension benefits under a labor contract. The district court, deciding the case under stipulated facts on cross-motions for summary judgment, held in favor of the employer. We affirm.
 
 
 2
 The individual plaintiffs in this case were employees at a bulk materials terminal in North Bend, Ohio. The terminal was a small facility with only about ten employees. They worked there for North Bend Terminal Company and the predecessor employer for a number of years. Until 1976, the employees were covered by a multi-employer defined contribution pension plan, which in 1976 required North Bend to contribute $22.60 per employee per month of service to a multi-employer pension fund. This plan provided a monthly benefit of $5 per year of service, with a minimum benefit of $50 and a maximum benefit of $100, to the extent that funds were available.
 
 
 3
 In November 1976, North Bend and the plaintiff union, United Steelworkers of America, entered negotiations for a new collective bargaining agreement, including modifications in the pension plan. After a brief strike, the parties settled on a new collective bargaining agreement on or about November 16, 1976. Article XIV of the agreement stated in full: "The employer agrees to make contributions on behalf of all eligible employees to a pension plan it has established with State Mutual of America, or equivalent coverage; a description of the plan has been given to the Union."
 
 
 4
 In fact, there seems to have been no description of the plan ever given to the Steelworkers. However, the parties have stipulated as follows:
 
 
 5
 15. In negotiations over pensions the Company proposed modifying the pre-existing plan changing it to a defined benefit plan (hereinafter the "amended plan"). It was agreed that the plan would provide a monthly benefit of $8.00 per year of service up to a maximum of 40 years of service and that North Bend would procure the plan from State Mutual Life Assurance Company or procure a similar plan. Neither in negotiations nor thereafter did the parties discuss specific terms of that plan.
 
 
 6
 16. During the negotiations surrounding the 1976 collective bargaining agreement, there was no discussion of whether North Bend had the right to terminate the plan or discontinue contributions if North Bend closed the bulk terminal facility at which all bargaining unit employees were employed. North Bend did not propose that it reserve the right to terminate the plan or discontinue contributions, and the Steelworkers made no proposals on these subjects.
 
 
 7
 Subsequently North Bend unilaterally drafted the plan documents. The Steelworkers took no part in preparing or approving this amended plan. North Bend reserved in the plan the right to terminate it at any time.
 
 
 8
 In 1978, North Bend decided for economic reasons to cease operations at this bulk terminal facility. By the end of November 1978, all employees in the bargaining unit were permanently laid off. The plan administrator on or about December 10, 1978, applied to the Pension Benefit Guaranty Corporation to terminate the plan. The Guaranty Corporation issued a notice of sufficiency for termination of the plan on December 17, 1979. The Steelworkers have pursued an administrative challenge to this determination.
 
 
 9
 According to the parties' stipulation,
 
 
 10
 29. Assuming that plaintiffs Rupe, Plunkett and Carr ceased to accrue service when their active employment with North Bend ended, the following are a list of the benefits called for under an unterminated plan, and a list of guaranteed benefits utilized by the PBGC in determining the sufficiency of assets:
 
 
 11
 Plan Benefit Guaranteed Benefit
 ------------ ------------------
Rupe $ 312.00 $ 62.40
Plunkett 296.00 59.20
Carr 262.22 20.32
 
 
 12
 The Guaranty Corporation presumably determined the guaranteed benefits under section 4022 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. Sec. 1322 considering the plan to have been in effect only one full year. The correctness of that determination is not before us.
 
 
 13
 The union and the three individual plaintiffs brought suit under ERISA Sec. 502, 29 U.S.C. Sec. 1132, and section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. Sec. 185, to compel North Bend to continue its contributions to the pension plan. They also alleged that individual defendant Claude Crowley, who authorized the preparation of the formal plan documents and then became plan administrator, had violated his fiduciary duty. The parties stipulated the facts and submitted briefs to the district court, which the court treated as cross-motions for summary judgment. The stipulation of facts included copies of the pension plan in effect until 1976, the collective bargaining agreement then entered into, and the new pension plan devised by North Bend.
 
 
 14
 The district court made a two-stage analysis of the ERISA and labor law claims. The court first determined that, as the amended plan expressly reserved to North Bend the right "to terminate the plan at any time" and discontinue contributions, the defendants were well within their rights under ERISA. Plaintiffs do not now contest that they have no independent claim under the plan. The court then considered whether defendants' acts violated the collective bargaining agreement. The court held that, as there was no provision that North Bend's obligation would survive the employer-employee relationship, survival did not occur. Consequently, North Bend did not breach the collective bargaining agreement when it stopped its funding and terminated the plan, and defendant Crowley did not breach his fiduciary duties. We affirm the judgment.
 
 
 15
 The pension plan in effect until 1976 was a defined contribution plan, under which the employer's contribution is fixed and the employee receives benefits the amount contributed on his behalf will provide. Alabama Power Co. v. Davis, 431 U.S. 581, 593 n. 18, 97 S.Ct. 2002, 2009 n. 18, 52 L.Ed.2d 595 (1977). The pension plan that took effect in 1976 was a defined benefit plan, under which the benefits to be received by employees are fixed and the employer's contribution is adjusted to whatever level is necessary to provide those benefits. Id. The insurance provisions of ERISA apply only to defined benefit plans. ERISA Secs. 3(35), 4021(b)(1), 29 U.S.C. Secs. 1002(35), 1321(b)(1).
 
 
 16
 Typically, as in this case, a defined benefit plan immediately assumes retroactive liability for past years of service. The minimum funding standards in ERISA require this unfunded past service liability to be amortized in equal annual installments over a period of thirty years. ERISA Sec. 302(b)(2)(B)(ii), 29 U.S.C. Sec. 1082(b)(2)(B)(ii).
 
 
 17
 The Pension Benefit Guaranty Corporation, a governmental entity established by ERISA, guarantees the payment of nonforfeitable benefits upon the termination of defined benefit plans. "Nonforfeitable" is synonymous with "vested," Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 376 & n. 25, 100 S.Ct. 1723, 1734 & n. 25, 64 L.Ed.2d 354 (1980), and is the preferable term in the ERISA context, because the non-ERISA meanings of "vested" often make its use confusing. The benefits of the individual plaintiffs in this case had become 100% nonforfeitable under the pension plan and under the minimum vesting standards of ERISA Sec. 203, 29 U.S.C. Sec. 1053. The Guaranty Corporation in general guarantees the payment of all nonforfeitable benefits, but where the pension plan has been in effect for less than five years, as here, it guarantees only a fraction of those benefits. ERISA Sec. 4022(b)(1), (7), 29 U.S.C. Sec. 1322(b)(1), (7).
 
 
 18
 When a plan terminates, the employer is liable to the Guaranty Corporation for any excess of the current value of the guaranteed benefits over the current value of the plan's assets allocable to those benefits. The employer's liability is limited, however, to thirty percent of its net worth. ERISA Sec. 4062(b), 29 U.S.C. Sec. 1362(b).
 
 
 19
 There are three possible sources of liability for pension benefits. Federal law sets out various minimum standards in ERISA, as just described. This statutory scheme does not, however, limit the employer's liability. See Murphy v. Heppenstall Co., 635 F.2d 233, 237-39 (3d Cir.1980), cert. denied, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982); In re M & M Transportation Co., 3 B.R. 722 (D.C.S.D.N.Y.1980). The pension plan itself may in some instances be an independent source of employer liability. A collective bargaining agreement containing a contractual obligation to provide a pension plan renders the employer liable for benefits in excess of those guaranteed by ERISA if the pension plan is of lower quality than promised in the agreement or if the plan in fact is not paying full benefits and the employer has not limited its liability.
 
 
 20
 In this case it is undisputed that North Bend has met its obligations under ERISA and the pension plan, but plaintiffs allege that the plan is not paying full benefits and the employer has not limited its liability. The case thus turns on the effect we give to the collective bargaining agreement. The enforcement and interpretation of that agreement is governed by federal law, but we may look to consistent common law rules of contract interpretation for guidance. Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456-57, 77 S.Ct. 912, 917-18, 1 L.Ed.2d 972 (1957); UAW v. Yard-Man, Inc., 716 F.2d 1476, 1479 (6th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).
 
 
 21
 Defendants argue that employees' rights under a collective bargaining agreement do not survive a discontinuance of business and a termination of operations, citing Fraser v. Magic Chef-Food Giant Markets, 324 F.2d 853, 856 (6th Cir.1963), unless that intent was expressly set out in the contract. This was the rule actually followed by the district court in its decision here.
 
 
 22
 Fraser was an action by employees to recover wages they did not receive after the employer closed a facility and laid off its workers. The court held that, because a collective bargaining agreement is a trade agreement rather than a contract of employment, the employees had no right to benefits for time not actually worked. In later decisions our circuit has held the rule in Fraser is inapplicable to vested pension benefits, which are compensation for time already worked. Schneider v. Electric Auto-Lite Co., 456 F.2d 366, 373 (6th Cir.1972); Upholsterers' International Union v. American Pad & Textile Co., 372 F.2d 427, 428 (6th Cir.1967).
 
 
 23
 Defendants also argue that it is improper even to look at the stipulation of a change to a defined benefit plan. Article XVIII of the collective bargaining agreement provides in part:The parties to this Agreement agree that, in the negotiations leading to the execution of the Agreement, each party had the unlimited opportunity to make all proposals desired by it and that the instant Agreement represents the complete understanding and agreement between the parties on all matters covered by this Agreement.
 
 
 24
 Defendants argue that admission of the stipulation would therefore be violative of the parol evidence rule. The stipulation of facts reserved "the right to object to the consideration of any such fact by the Court on grounds of relevance or materiality." Defendants thus would limit evidence of the agreement to the contractual provision that "[t]he employer agrees to make contributions ... to a pension plan." They submit that this indicates only an obligation to make contributions to a plan, not to fund it fully.
 
 
 25
 North Bend agreed "to make contributions to a pension plan it has established with State Mutual of America, or equivalent coverage; a description of the plan has been given to the Union." Those words, although a final agreement, certainly require us to look outside the contract. In particular, the obligation "to make contributions" is consistent either with an obligation to make contributions only during the lifetime of the facility, or to make contributions until the plan is fully funded.
 
 
 26
 Recourse to the stipulation does not, however, end the matter. Although it has been suggested that stipulations are to be interpreted in the same manner as contracts, In re Bolton Hall Nursing Home, 31 B.R. 765, 769 (Bankr.D.Mass.1983), here the stipulation is not actually the contract we are interpreting. The original collective bargaining agreement is the contract being interpreted, and the stipulation is admissible parol evidence of the negotiation of that agreement. As such, it must be taken as a description of the agreement, rather than a contract in its own right. A collective bargaining agreement may either disclaim liability or not. For example, of the 136 pension plans terminated between September 2, 1974, and December 31, 1975, under the insurance provisions of ERISA, seventy-eight had limitation-of-liability provisions. Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 378 n. 28, 100 S.Ct. 1723, 1735 n. 28, 64 L.Ed.2d 354 (1980). Because the stipulation does not indicate whether this plan would have limited liability, the question remains open.
 
 
 27
 Defendants argue that the explicit language of the pension plan allows its termination. Section 5.03 reads in part, "[T]he employer ... reserves the right to terminate the plan at any time." That contention would prevail, were the plan's terms integrated into the collective bargaining agreement. See International Union of United Brewery Workers v. Duke & Co., 373 F.Supp. 778 (W.D.Pa.1974), aff'd mem., 510 F.2d 969 (3d Cir.1975). Here there could be no such integration, for the plaintiffs were not even aware of the terms of the plan. The plan is not without value, however, for it serves as a more or less contemporaneous expression of North Bend's understanding of the agreement.
 
 
 28
 The promise to provide a fully funded defined benefit pension plan consists of two parts: the promise to fund the plan upon actuarially sound principles during normal business operations, and the promise to complete the plan's funding if its normal funding is disrupted. There is no question that the first promise was made and fulfilled.
 
 
 29
 We cannot say, however, that there was ever a meeting of the minds that North Bend would be obligated to continue funding the pension plan after it closed the facility. The collective bargaining agreement itself is ambiguous, but this much is clear: North Bend was obligated to make contributions to the plan. There is no convincing indication that North Bend was obligated to fund the plan fully. North Bend's own contemporaneous good-faith interpretation, embodied in the formal plan documents, was that it had no post-termination liability. The parties themselves have stipulated that post-termination liability was not even discussed in the negotiations.
 
 
 30
 The traditional judicial response, once such a mutual misunderstanding has emerged, is to say that there was no contract. See Flower City Painting Contractors v. Gumina Construction Co., 591 F.2d 162 (2d Cir.1979); Raffles v. Wichelhaus, 2 Hurl. & C. 906, 159 Eng.Rep. 375 (Ex.1864) (the ship Peerless case). This is not a reasonable answer here, for there plainly was a contract that has, so far as we know, been fully performed in every respect not involving pension benefits. Nor is this an appropriate case for the court to supply a term. See Restatement (Second) of Contracts Sec. 204 (1981). The terms typically supplied by courts are a reasonable price, see U.C.C. Sec. 2-305, or a time requirement, e.g., Barco Urban Renewal Corp. v. Housing Authority of Atlantic City, 674 F.2d 1001, 1007 (3d Cir.1982). Here there is no such range of possible solutions, but we must inevitably choose one party's interpretation over the other.
 
 
 31
 We choose instead to follow the holding in Frigaliment Importing Co. v. B.N.S. International Sales Corp., 190 F.Supp. 116, 121 (S.D.N.Y.1960). The dispute in Frigaliment was whether the word "chicken," used in a contract for the sale of goods, meant only young fryers, as the plaintiff buyer contended, or might also refer to less valuable stewing chickens, as the defendant seller argued. Judge Friendly ruled that, where the defendant subjectively believed it could comply with the contract by supplying stewing chickens and that coincided with an objective meaning of "chicken," plaintiff had not met its burden of showing that "chicken" was used in the narrower rather than in the broader sense. We hold that, where there is a mutual misunderstanding as to a contract term and the options discussed in the previous paragraph are not open to the court, the court will rule against the party bearing the burden of proof. Because the whole burden of proof is on the party alleging breach of a collective bargaining agreement under section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185, see UAW v. Roblin Industries, 561 F.Supp. 288, 297 (W.D.Mich.1983); General Warehousemen's Union Local 852 v. Reliance Electric Co., 386 F.Supp. 1303, 1307 (S.D.N.Y.1973), we hold for defendants.
 
 
 32
 We emphasize that our holding is bound to its specific facts. In particular, we do not hold that an employer's liability for full funding of a pension plan must be separately expressed if it is to be bound. Had the whole provision of the actual contract read, "The Company agrees to fund a defined benefit pension plan providing a monthly benefit of $8.00 per year of service," that might well have bound the employer fully. Although the facts of this case made it necessary to consider whether North Bend's obligation included liability for full funding, the more normal course would be to find an obligation to provide a defined benefit pension plan, then consider whether the employer has limited its liability.
 
 
 33
 We hold that North Bend had no contractual duty to continue funding the pension plan after its facility closed. It follows that Crawley, the plan administrator, did not violate any fiduciary duty.
 
 
 34
 The judgment is affirmed.