**James GRIMES, et al., Plaintiffs,**

**v.**

**DAYTON–WALTHER CORP.,**
**Defendants.**

**No. C–3–85–026.**

United States District Court,
S.D. Ohio, W.D.

Aug. 7, 1987.

James B. Robinson, David M. Cook, Cincinnati, Ohio, for plaintiffs.

Frank H. Stewart, Martin McHenry, Cincinnati, Ohio, for defendants.

OPINION; FINDINGS OF FACTS AND CONCLUSIONS OF LAW; FURTHER PROCEDURES SET FOR PAYMENT OF BENEFITS DUE PLAINTIFFS, TO WIT: DEFENDANT GRANTED TWENTY DAYS FROM RECEIPT OF OPINION TO FILE PLAN TO GUARANTEE FUTURE BENEFITS AND PLAINTIFFS AND DEFENDANT GRANTED TWENTY DAYS TO FILE STIPULATIONS AS TO BENEFITS PAST DUE OR TO NOTIFY COURT THAT SUCH STIPULATIONS CANNOT BE REACHED

RICE, District Judge.

This case was heard by the Court, sitting as trier of fact, on September 16–23, 1986. On November 11, 1986, the Court filed an Opinion (Doc. # 64) indicating its intent to enter judgment for the Plaintiffs and

against the Defendant on Plaintiffs' breach of the collective bargaining (pension) agreement claim and for Defendant and against Plaintiffs on their Employee Retirement Income Security Act (29 U.S.C. §§ 1104 & 1109) claim. Additionally, the Court indicated its *present* intent not to require Defendant to make a "lump sum" payment to Plaintiffs to cover future benefits. Based upon the exhibits and testimony admitted at trial, the Court hereby sets forth the following, non-exclusive Findings of Facts and Conclusions of Law:

## I. FINDINGS OF FACT

1. The Defendant, Dayton–Walther Corporation, is an employer engaged in interstate commerce.

2. The Plaintiffs are: (a) a class of 191 Dayton–Walther retirees and 29 surviving spouses of deceased retirees who have been adversely affected by a discontinuance in supplemental early retirement benefits who retired *prior* to this reduction in benefits *and* (b) two individuals (Quire and Profitt) who retired *subsequent* to this reduction in benefits, and who would have been eligible for supplemental early retirement benefit payments had such payments not been discontinued.

3. Locals 4760 and 5028 of the United Steelworkers of America represent, and have represented, for purposes of collective bargaining certain active employees of Dayton–Walther.

4. Dayton–Walther established a pension plan for its employees represented by the Locals ("Pension Plan" or "Plan") in the 1950's.

5. The Plan's formal name is Pension Plan Dayton Division and United Steelworkers of America Locals 4760 and 5028.

6. The Plan was designated as Plan No. 002 for federal reporting purposes.

7. Dayton–Walther administered the Plan and was the Plan sponsor.

8. Dayton–Walther's federal employer identification number is 31–0258830.

9. Since the establishment of the Pension Plan, Dayton–Walther and Locals 4760 and 5028 have entered into various pension agreements.

10. The last pension agreement between Dayton–Walther and the Locals expired by its terms on August 1, 1983. (Jt. Exh. IX).

11. Dayton–Walther and the Locals agreed to extend the last pension agreement to July 31, 1984. (Defendant's Exh. AAAAE).

12. Dayton–Walther and the Locals did not agree to extend the pension agreement beyond July 31, 1984.

13. On May 25, 1984, representatives of Dayton–Walther gave timely written notice to the Locals of Dayton–Walther's intent to negotiate pensions. (Defendant's Exh. AAR).

14. Representatives of the Locals and Dayton–Walther negotiated on pensions throughout the summer of 1984, and thereafter.

15. In June of 1984, representatives of Dayton–Walther met with officials of the Pension Benefit Guaranty Corporation ("PBGC") to discuss the possible termination of the Plan.

16. On or about July 10, 1984, in a collective bargaining meeting, Dayton–Walther proposed termination of the Plan.

17. The representatives of the Locals rejected this proposal.

18. The Locals and Dayton–Walther reached impasse on the proposed termination of the Plan.

19. On October 6, 1984, Dayton–Walther's Board of Directors passed a resolution terminating the Plan effective October 31, 1984.

20. On October 8, 1984, Dayton–Walther gave notice of the proposed Plan termination to participants and beneficiaries of the Plan.

21. On October 18, 1984, Internal Revenue Service ("IRS") and PBGC Form 5310 (Application for Determination Upon Termination and Notice of Intent to Terminate) was filed on behalf of Dayton–Walther with the IRS and the PBGC. (Defendant's Exh. AAI).

22. The obligation of benefits of approximately two hundred and fifty (250) retirees who had been receiving benefits under the Plan were transferred to Dayton–Walther's pension plan for salaried employees. (Defendant's Exh. AAF). The benefits of retirees transferred to the salaried plan have not been reduced since Plan termination. These two hundred and fifty retirees are not members of the class of Plaintiffs in this case.

23. On March 18, 1985, the IRS issued a determination approving this transfer. (Defendant's Exh. AAS).

24. Before October 31, 1984, substantially all of the assets of the Plan were used to purchase annuities to pay benefits to two hundred and five (205) retirees under the Plan. These two hundred and five retirees are not members of the class of Plaintiffs in this case.

25. The PBGC assumed administration of the Plan in accordance with an agreement with Dayton–Walther dated July 1, 1985. (Defendant's Exh. AA).

26. The IRS approved the termination of the Plan in a determination dated April 24, 1985. (Defendant's Exh. AAT).

27. The Defendant transferred to the PBGC approximately one and a half million dollars ($1,500,000) to satisfy the Defendant's estimated liability for PBGC guaranteed benefits.

28. Since Plan termination, benefits have been provided at PBGC guaranteed levels, which are lower than total benefit levels were under the Plan.

29. The greatest reduction in benefits has occurred in benefits received by retirees who took early retirement and were receiving a pre-Social Security supplemental payment (i.e., an additional payment made until a retiree became eligible for Social Security benefits). Benefits under the Plan prior to its termination included a regular retirement pension payable in monthly installments computed on the basis of the employee's pre-retirement earnings or based on a fixed multiplier times the employee's years of service. Retirees under the age of 62 were entitled to a supplemental benefit, set at $400 per month by the 1980 pension agreement. (Jt. Exh. IX at 30).

30. W.C. Mattingly was employed by Dayton–Walther and was represented for purposes of collective bargaining by Local 4760 from June, 1950 until his retirement effective August 3, 1980. James Grimes was employed by Dayton–Walther and was represented for purposes of collective bargaining by Local 5028 from March, 1955 until his retirement effective August 1, 1984. Mattingly and Grimes and the class of Plaintiffs they represent have received since December 1, 1984, and thereafter, monthly pension checks less than those that they received before October 31, 1984. (The Court assumes that benefits received for October, 1984, were actually paid on November 1, 1984, and that the benefits paid on December 1, 1984, were those due for the month of November, 1984).

31. Robert C. Quire and Eugene E. Profitt were employed by Dayton–Walther from 1956 through October, 1984. Quire and Profitt retired as of October 31, 1984, and have not received all benefits to which they would have been entitled had the Plan not been terminated. (The Court assumes that the fact that Quire and Profitt retired on October 31, 1981 means that date was their last day at work and thus that their entitlement to pension benefits actually began on November 1, 1984; thus, their retirement would have been subsequent to the reduction in benefits).

32. In 1980 and subsequent years, the Company presented all retiring members of the two Locals with forms indicating that supplemental benefits in amounts set forth on the application were payable until the participant was "eligible for reduced Soc. Sec.", and that basic benefits in stated amounts were payable for the participant's lifetime (and his spouse's if the survivor option was chosen) (Testimony of Mattingly and Grimes; Plaintiffs' Exhibit No. 10(13), pp. A, C). These forms, and the statements made by the Company when it presented the forms, reflect an understanding and agreement on the part of the Company that the benefits were guaran-

teed. The prospective retirees signed these forms as retirement applications.

33. Section VI(1)(B) of the Pension Agreement that went into effect August 1, 1980, provides:

Any individual who shall claim the right to any payment under the Plan shall be limited to payments from the Pension Fund only.

(Jt. Exh. IX at 45).

34. Section VIII of the Pension Agreement that went into effect August 1, 1980, provides:

### LIABILITY LIMITED

To the extent permitted by law, in administering the Plan and the payment of benefits neither the Pension Board or any member thereof, not [sic] the Board of Directors of the Company or any member thereof, not [sic] any Employing Company or any officers or employees thereof, shall be liable for any acts of omission or commission except for individual willful and intentional malfeasance or misfeasance. The Employing Company, its officers and directors, and the Pension Board shall be entitled to rely conclusively on all tables, valuations, certificates, opinions, and reports which shall be furnished by an actuary, accountant, trustee, counsel or other expert who shall be employed or engaged by the Pension Board.

(Jt. Exh. IX at 46).

35. Section X of the Pension Agreement that went into effect August 1, 1980, provides:

### DISTRIBUTION OF ASSETS OF PENSION FUND ON DISCONTINUANCE

In the event that the Plan shall be discontinued, the assets then remaining in the Pension Fund shall be applied in the following order, all persons in each class being entitled to their respective proportionate shares:

1. First, an amount shall be allocated to provide Retirement Income (excluding any increases in such Retirement Income benefits resulting from Plan amendments during the preceding five (5) years), to all participants, their joint annuitants and Beneficiaries:

(A) To whom retirement income benefits have been paid for at least three (3) years prior to the date of Plan termination (taking the lowest benefit in pay status during any three (3) year period used), and

(B) To whom retirement income benefits (other than those described in the foregoing subparagraph) would have been payable had the participant been eligible for and actually retired on a retirement date at least three (3) years prior to the date of Plan termination, if such retirement income benefits had commenced under the normal form of benefit payment under the Plan as of the beginning of such period.

2. Second, amounts then remaining shall be allocated to provide retirement income not provided above, for all participants entitled to any additional benefits under the foregoing Paragraph 1, and for all participants, if any, entitled to retirement income pursuant to Section I, or who would be entitled to such retirement income if their service were terminated on the date of Plan termination, to the extent such retirement income is guaranteed by the Pension Benefit Guaranty Corporation.

3. Third, amounts then remaining shall be allocated to provide retirement income for all participants, if any, entitled to retirement income pursuant to Section I, or who would be entitled to such retirement income if their service were terminated on the date of Plan termination, to the extent such vested benefits have not been provided for under the foregoing Paragraph 2.

4. Fourth, amounts then remaining shall be allocated to provide accrued retirement income for all participants not provided for above.

5. Amounts allocated in accordance with Section X, Paragraph 1 through 4 may be applied, in the discretion of the Employer and the Union, to provide re-

tirement income benefits through the purchase of paid-up annuities on an individual or group basis, or any other means deemed appropriate.

(Jt. Exh. IX at 47–48).

36. Section XIII(1) of the Pension Agreement that went into effect August 1, 1980, provides:

Any benefit properly payable pursuant to this Agreement shall continue to be payable, notwithstanding the termination or expiration of this agreement.

(Jt. Exh. IX at 49).

37. The two Locals and the Company have been parties to a series of pension agreements from 1955 to 1984 (Joint Exhibits II through IX, X, XII).

38. The 1955 pension agreement provided that "No pension payable pursuant to this Part II shall be discontinued or reduced except as provided in Paragraph 2 of Section I and in Section II thereof" (Joint Exhibit II, Section VIII(1)). The 1970 pension agreement provided that "No pension properly payable pursuant to this agreement shall be discontinued or reduced except as provided in Paragraph 3 of Section I and in Sections II and III hereof" (Joint Exhibit VI, Section VIII(1)).

39. Over a period of nine or ten months prior to the start of pension negotiations in June, 1973, numerous members of Local 4760 and 5028 expressed concern as to the future of their pensions. These concerns were echoed by members of the Local's Bargaining Committee, and specifically in negotiations by newly elected Local 4760 Committee member W.C. Mattingly. Mattingly specifically urged the Company in negotiations in June, 1973, that employees and retirees of the Dayton Division should not risk losing their pensions, and that the corporation should guarantee them. Mattingly specifically referred to the fear of the membership that the Dayton Division of the Corporation might not always exist. Owen Girten referred to this expression of concern having been verbalized over an 8–10 month period in Local Union meetings, sparked by Dayton work being moved to Muncie, Indiana, or Kentucky.

40. Owen Girten, Staff Representative with the United Steelworkers of America, was involved in the 1973 and all subsequent negotiations with the Company.

41. Joseph Senturia, a pension consultant from the offices of Murray H. Latimer, was assigned by USWA International to assist Staff Representative Owen Girten and Locals 4760 and 5028 in the 1973 pension negotiations.

42. Joseph Senturia advised W.C. Mattingly that he had language brought from Basic Steel that would guarantee his pension.

43. In June, 1973, Joseph Senturia proposed language to Defendant which he stated he brought from the Basic Steel agreement. He said it was intended to close potential loopholes in the existing Dayton–Walther guarantee language, and would act as a Corporate guarantee of all benefits payable pursuant to the Pension Agreement. The proposed language read: "Any benefit properly payable pursuant to this Agreement shall continue to be payable notwithstanding the termination or expiration of this Agreement".

44. When Senturia proposed the guarantee language, a representative of the Defendant stated that he doubted any one at the negotiating table for the Company had authority to take on that type of responsibility. Local 5028 President James Grimes stated that the Company should get someone at the table who did have authority to agree. After a caucus, Company spokesman and Chief Negotiator Jack Ridler returned, and stated that he and his Committee did, in fact, have authority to agree. The guarantee language was accepted verbatim as proposed by Senturia. (Joint Exhibit VII, Section VIII(1)).

45. Subsequent to the negotiation of the guarantee language, and certain economic changes in the Pension Agreement, Senturia and Defendant's actuary negotiated via telephone a Memorandum of Agreement on Funding (Joint Exhibit VII, p. 44). The purpose of this agreement on funding was to insure regular contributions to the Pension Fund, to assure a corpus for the payment of benefits and to preserve some as-

sets in the case of insolvency of the corporation.

46. In letters from Owen Girten to the USWA International Union (Defendant's Exh. AAAX) and from Joseph Stenturia to Owen Girten (Defendant's Exh. AAAP(1)) no mention was made of negotiation of a benefits guarantee in the 1973 Agreement.

47. In 1976, the parties negotiated jointly (the Company and both Local Unions) on issues with respect to pensions and other matters. (Defendant's Exhibit AAAA).

48. In April, 1976, Company Official Ken Dubis had submitted to Staff Representative Girten a set of proposed amendments to the Pension Agreement, described in a cover letter as primarily intended to comply with the provisions of the recently enacted Employee Retirement Income Security Act of 1974 ("ERISA"). (Plaintiff's Exhibit 26). Mr. Girten sent the proposed amendments to International headquarters in Pittsburgh, Pennsylvania for review and analysis. These proposals were not returned to Mr. Girten prior to the completion of negotiations on all economic aspects of the Pension Agreement in late September and early October, 1976. (Defendant's Exhibit AAAB).

49. On several occasions, when inquiry was made as to the meaning of the proposed pension language, the Company's Chief Spokesman and Negotiator Jack Ridler stated to Mr. Girten and the Local Committees that the proposed amendments were intended solely to comply with ERISA, and were not intended to take away any benefits the people already possessed.

50. The Company's 1976 Proposed Amendments and Proposed Pension Agreement both retained verbatim the 1973 guarantee language. (Plaintiff's Exhibits 27 & 28).

51. The Company's Proposed Pension Agreement contained a Section X, ¶ 1, which read:

> If the Plan is terminated, the Company has no obligation to fund benefits beyond the point already funded, except to the

extent of additional funding as may be required by the PBGC. (Plaintiff's Exhibit 28).

52. On December 1, 1976, Robert Pryor, United Steelworkers of America Pension Representative, and the Local Committees, objected to the proposed Section X, ¶ 1. The Company explicitly dropped the language as being in conflict with other provisions of the agreement.

53. Subsequent to negotiation of the language of the Pension Agreement, the company actuary and Joseph Senturia negotiated a new Memorandum of Agreement on funding (Jt. Exh. No. VIII, p. 51). This Memorandum of Agreement accelerated the funding of "past service liabilities" to a 24 year period as opposed to the minimum funding period of 40 years for those liabilities permitted by ERISA.

54. The purpose of the accelerated funding of past service liabilities in 1976 was to again assure the presence of as large an amount of assets in the Pension Fund as possible, in the event of liquidation or insolvency by the Company.

55. The language of Section VI(1)(B) was neither intended by the Company nor explained by the Company in 1976 as limiting corporation liability, nor was it understood by the Union at that time to limit corporate liability in any fashion.

56. The parties executed the 1976 Pension Agreement on February 22, 1977, only after the Company agreed to restrict the language of the new Section X to the requirements of ERISA. (Jt. Exh. VIII, Section X).

57. In negotiations for the 1980 Pension Agreement, the parties agreed to increase the "multiplier" (calculation of basic benefit by multiplying a dollar per month figure times an employee's years of net credited service), to lower the age of early retirement from 30 to 28 years of service, and to increase the "supplement" paid to early retirees until they became eligible for Social Security from $250 per month to $400 per month.

58. At the request of the Company in 1980, Section X of the Pension Agreement

was expanded to set forth ERISA requirements on the Distribution and Allocation of Assets on Plan Termination. Section XIII(1), and the 1976 Memorandum of Agreement on Funding were retained verbatim.

59. David Kass, enrolled actuary for the Plan in 1984, advised the Company that under Section XIII(1) participants would have, upon termination of the plan, valid claims for benefits beyond the level guaranteed by the PBGC.

60. The Defendant's actions in not paying benefits beyond the PBGC guarantee to Plaintiffs have been consistent with its interpretation of the Plan. The Defendant did not recognize a "guarantee" liability on its balance sheet. The Defendant did not identify a "guarantee" obligation above and beyond that of the PBGC in the Summary Plan Description. (Jt. Exhs. VIII–IX). Defendant received legal advice that termination of the Pension Plan without continued payment of supplemental early retirement benefits to Plaintiffs was within its legal rights.

61. Plaintiffs have been damaged in the amounts set forth in the Reports of Actuary Claude Poulin, dated February 21, 1986, July 2 and July 8, 1986 for retirees, and September 5, 1986, for surviving spouses, the total amount being $3,359,229.00 through June 30, 1986, and approximately five percent more for each month thereafter.

## II. DISCUSSION

Plaintiffs in this case have made claims for relief against the Defendant under both their Local Union's pension agreements with the Defendant and under the fiduciary duties imposed upon Defendant as a Plan Administrator under the Employee Retirement Income Security Act of 1974 ("ERISA"). Specifically, Plaintiffs' claims for relief against the Defendant raise the following issues:

1. While all language in the pension agreement that might constitute a Company guarantee of benefit refers to all benefits, including supplemental early retirement benefits, only the Plain-

1. Did the 1980 Pension Agreement require continued payment of all benefits thereunder by the Defendant to the Plaintiffs, including supplemental early retirement benefits (in other words, is the Company obligated by the pension agreement to continue to pay benefits to the Plaintiffs above those guaranteed by the PBGC)? [1]

2. If the contract so requires, did the Defendant in its capacity as Plan Administrator breach his fiduciary duty to Plaintiffs in failing to require the employer (itself) to pay such benefits? and

3. If the contract provides that such benefits are guaranteed by the pension agreement, should the Defendant be required to make a lump sum payment to the Plaintiffs to cover the costs of future supplemental early retirement benefits payable?

The Court will consider these issues in order.

## A. CONTRACTUAL OBLIGATIONS OF THE DEFENDANT

In considering Plaintiffs' claims for supplemental early retirement benefits under the pension agreement which took effect August 1, 1980 (Jt. Exh. IX), the Court notes that there are several possible sources of liability for pension benefits. As the Sixth Circuit has said:

> There are three possible sources of liability for pension benefits. Federal law sets out various minimum standards in ERISA.... This statutory scheme does not, however, limit the employer's liability. *See Murphy v. Heppenstall Co.*, 635 F.2d 233, 237–39 (3d Cir.1980), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 999, 71 L.ed.2d 293 (1982); *In re M & M Transportation Co.*, 3 B.R. 722 (S.D.N.Y.1980). The pension plan itself may in some instances be an independent source of employer liability. A collective bargaining agreement containing a contractual obligation to provide a pension plan renders

tiffs' right to continued payment of supplemental early retirement benefits is an issue in this case.

the employer liable for benefits in excess of those guaranteed by ERISA if the pension plan is of lower quality than promised in the agreement or if the plan in fact is not paying full benefits and the employer has not limited its liability. *United Steelworkers of America v. North Bend Terminal Co.*, 752 F.2d 256, 259 (6th Cir.1985). In their first claim for relief, Plaintiffs do not dispute that Dayton–Walther has met its obligations under ERISA,[2] but they "allege that the plan is not paying full benefits and that the employer has not limited its liability." *Id.*

■ In determining whether Defendant has breached the pension agreement here in question, the Court must apply the substantive federal law governing enforcement and interpretation of collective bargaining agreements under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. *See International UAW v. Yard–Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983). In *Yard–Man*, the Sixth Circuit elaborated on the requisite analysis under § 301:

Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements. For example, the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. *Kellog Co. [v. NLRB*, 457 F.2d 519, 524 (6th Cir.1972)]. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. *See Randall v. Lodge No. 1076, International Ass'n of Machinists and Aerospace Workers, AFL–CIO*, 648 F.2d 462 (7th Cir.1981); *Forest Industries, Inc. v. Local Union No. 3–436, International Woodworkers of America, AFL–CIO*, 381 F.2d 144, 146 (9th Cir.1967); *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 570, 80 S.Ct. 1343, 1364, 4 L.ed. 2d 1403 (1960) (Brennan, J., concurring). The court should also interpret each provision in question as part of the integrated whole. If possible each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. *Kellog Co., supra,* 457 F.2d at 524. *See Randall, supra,* 648 F.2d at 466; *Florida Canada Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193 (6th Cir. 1960). As in all contracts, the collective bargaining agreement's terms must be construed so as to render non-nugatory and avoid illusory promises. *See Cordovan Associates, Inc. v. Dayton Rubber Company*, 290 F.2d 858, 861 (6th Cir. 1961). Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a position whose intended duration is ambiguous. *See [Upholsterers International Union v.] American Pad [& Textile Company]*, 372 F.2d 427–28 (6th Cir. 1967); *Kellog Co., supra,* 457 F.2d at 524. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy but rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law.

*Id.* at 1479–80; *see also Weimer v. Kurz Kasch, Inc.*, 773 F.2d 669, 673 (6th Cir. 1985); *Policy v. Powell Press Steel*, 770 F.2d 609, 614 (6th Cir.1985).

■ In other words, a court must first look to the explicit language of a collective bargaining agreement to determine whether benefits contained therein were intended by the parties to continue after the termination of the agreement. However, the language of the agreement must not be read in isolation, but must be reviewed

---

2. Specifically, Plaintiffs concede that Dayton–Walther has paid to the PBGC sufficient funds to cover the pension benefits guaranteed by ERISA to be paid by the PBGC.

with an understanding of the context of that language in the whole of the agreement. The Court must attempt to interpret each term of the agreement so as to produce a consistent whole. If a court finds, after reading the individual sections of the agreement in the context of the whole, that the agreement is ambiguous, it may refer to parol evidence to determine the intent of the parties in drafting the agreement. *See Transportation Union v. Pacific Railroad,* 385 U.S. 157, 161, 87 S.Ct. 369, 371–72, 17 L.Ed.2d 264 (1966); *Harris v. Lockheed Aircraft Corporation,* 572 F.2d 138, 141 (6th Cir.1978); *International Association of Machinists and Aerospace Workers Lodge No. 1194 v. Sargent Industries,* 522 F.2d 280, 282 (6th Cir.1975); *Local 783 v. General Electric Company,* 471 F.2d 751, 757 (6th Cir.1973) ("After a finding of ambiguity [in the collective bargaining agreement] has been made, evidence of the surrounding circumstances and the practical construction of the parties is admissible to aid in its interpretation."). Finally, the Court must review its interpretation derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy.

Applying this analysis to the facts in evidence in this case, the Court begins with a review of the language of the 1980 Pension Agreement (Jt. Exh. IX). Section II(5) of that agreement states "Any employee receiving a regular pension pursuant to Paragraph 5 of Section I shall receive a supplemental monthly benefit of ... four hundred dollars ($400.00)." Section XIII(1) of the agreement provides: "Any benefit properly payable pursuant to this Agreement shall continue to be payable, notwithstanding the termination or expiration of this agreement." On the other hand, Section V(1)(B) provides: "Any individual who shall claim the right to any payment under the Plan shall be limited to payment from the Pension Fund only." Section VIII of the agreement contains a limitation of liability, *inter alia,* of the employing Company except in cases of individual willful and intentional malfeasance or misfeasance. Finally, Section X of the agreement contains a plan for distribution of assets of the

pension fund upon discontinuance of the plan.

■ Reviewing these sections *individually,* outside the context of the whole agreement, they appear *un*ambiguous. Sections II(5) and XIII(1) seem to indicate that supplemental early retirement benefits will continue to be payable after termination of the plan. Sections VI(1)(B), VIII and X, on the other hand, seem to indicate that payment of such benefits is limited to payments from plan assets. When these various sections are read *together,* however, language which is *un*ambiguous when considered separately becomes *am*biguous when the agreement is considered as a whole, because contradictory understandings of the obligations imposed by the agreement arise between some portions of the agreement (Section II(5) and XIII) and others (Sections V(1)(B), VIII and X). Thus, taking the agreement as a whole, the Court must find it *am*biguous with regard to whether the Defendant is liable for benefits provided therein that are not protected under ERISA's provisions for a PBGC guarantee.

Moreover, the Court finds that there are two possible ways in which these provisions can be read so as to make the agreement as a whole consistent. One reading of these provisions, that advocated by Plaintiffs, would find that Section XIII(1) is a guarantee by the Company that supplemental early retirement benefits will be paid after termination of the pension plan. Under this reading of the agreement, Section VI(1)(B) only limits the mechanism by which payments are to be made (i.e., it bars the Company from making retirement payments directly to employees and instead requires that the Company make payments to the plan fund which then makes payments to the employees). Furthermore, under this reading, Section VIII of the agreement only protects the Company from liability for bad or fraudulent investments after it has made sufficient payments to the plan, based upon actuarial estimates, to guarantee payment of the supplemental early retirement benefits. Section X, under this reading of the agreement, only has

meaning when because of the financial insolvency of the company, the assets of the pension plan are insufficient to meet all obligations.

The other consistent reading of the agreement, that proposed by Defendant, argues that Section XIII(1) does not provide a guarantee of benefits by the Company, but only means that the plan would continue even were the pension agreement to expire without renewal. This reading of the contract thus would construe Section VI(1)(B) as a limitation on the liability of the company in the event of a plan termination.

In light of these two diametrically opposite (albeit consistent within themselves) readings of the 1980 Pension Agreement which would give meaning to each term of the agreement, the Court must find that the agreement taken as a whole is ambiguous, and accordingly turns to parol evidence of the negotiations leading up to the 1980 Pension Agreement to determine its meaning. The Court, therefore, must examine the evidence presented at trial concerning the history of collective bargaining agreements at Dayton–Walther in order to determine whether the Defendant is liable for continued payment of supplemental early retirement benefits.

In reviewing the history of the pension agreements between Plaintiffs' Local Unions and the Defendant, the Court first turns to the 1973 negotiations. Prior to 1973, the pension agreement between the Locals and Dayton–Walther contained a provision analogous to the 1980 agreement Section II(5), but did not contain provisions analogous to the other sections here in dispute. A review of the 1973 Pension Agreement negotiations demonstrates, however, that a provision identical to the present Section XIII(1) was inserted into the Pension Agreement at that time and was intended by all concerned to constitute a guarantee of all benefits by the Company. The testimony of W.C. Mattingly and

Owen Girten at trial indicated that members of the Local Unions were concerned in 1973 about whether payment of benefits under the pension agreement would continue if the Pension Fund collapsed. The testimony of Joseph Senturia at trial indicated that he brought the provision presently identified as Section XIII(1) from the Basic Steel Agreement (an agreement between the United Steelworkers and major steel companies) as a guarantee of pension benefits by the Company. The testimony further indicated that the Company's negotiators understood this provision as a guarantee of benefits, in that they initially told the union negotiators that they had no authority to bind the Company to such an agreement.[3]

The Court does note that there was some evidence at trial weighing against a finding that this clause would serve as a Company guarantee of benefits, specifically, the facts that Mr. Girten did not inform the International Union that he had negotiated a guarantee in his letter to them regarding the 1973 negotiations (Defendant's Exh. AAAX) and that Senturia did not mention a guarantee in his letter to Mr. Girten after the negotiations (Defendant's Exh. AAAP(1)). Nevertheless, weighing all the evidence together, and particularly in light of the Company negotiators' initial reluctance to agree to that provision (a provision that could have caused the Company no harm if given the construction the Defendant now advocates), the Court must find that in the 1973 negotiations, acceptance of the provision analogous to Section XIII(1) manifested an intention on behalf of both the Company and the Local Unions to have the Company guarantee pension benefits in case of a fund insufficiency.

The Court also notes that the timing of the adoption of Section XIII(1) weighs against Defendant's argument that because that provision uses the term "agreement" rather than the term "plan" it does

---

**3.** The Court notes that Jack Ridler, Dayton–Walther's chief negotiator in both 1973 and 1976, was unavailable to testify at trial in this case. While the Court is aware that Mr. Ridler did not testify because he was unavailable and not because Defendant chose not to call him, the absence of his testimony in fact leaves unrebutted much of Plaintiffs' evidence concerning the 1973 and 1976 negotiation.

not provide a guarantee of benefits provided for in the pension plan. Because this provision was adopted prior to the adoption of ERISA (ERISA was enacted by Congress in 1974), the distinction between plan and agreement loses its weight. The distinction between a pension agreement and a pension plan is a concept made meaningful only by the adoption of ERISA, because ERISA conceptualizes benefit protection in terms of a *plan.* Prior to the adoption of ERISA, pension benefits were protected only insofar as a pension *agreement* provided. While it is unfortunate that the parties did not modify the language of Section XIII(1) following the adoption of ERISA to bring it into line with ERISA's conceptualization of benefit protection, this failure alone does not indicate an intent on the part of the parties to abandon the guarantee negotiated in 1973.

Turning to the 1976 negotiations, a review thereof leads the Court to conclude that Sections VI(1)(B), VIII and X were inserted into the Pension Agreement to bring it into line with the ERISA concept of a pension plan and not to limit the Section XIII(1) guarantee of benefits by the Company. The letter of Ken Dubis to Owen Girten at the time of the 1976 negotiations indicated that the changes proposed by the Company to the pension agreement were intended to bring the plan into line with the provisions of ERISA (*see* Plaintiff's Exh. 26). During the course of the negotiations, Defendant's representatives made several statements indicating that their proposals were merely intended to conform the agreement to ERISA's requirements. Moreover, during the course of the negotiations, the Plaintiff's unions specifically rejected a proposed Section X, ¶ 1 which would have read "If the plan is terminated, the company has no obligation to fund benefits beyond the point already funded, except to the extent of additional funding as may be required by the PBGC." (Plaintiff's Exh. 28). As stated previously (Finding of Fact # 52), the Company explicitly dropped the language as being in conflict with other provisions of the agreement. Finally, the Court notes that Section XIII(1) was retained in its entirety. While the Court does note that Union Representative Robert Pryor expressed doubt as to whether some of the language proposed was required by ERISA, the Court also notes that there was no indication that the Company agreed with this assessment and said that they wanted the language incorporated anyway. Rather, all evidence at trial indicated that the Company brought this language in with an intent to make the agreement comply with the requirements of ERISA.

■ The Defendant's evidence, moreover, did not directly contradict Plaintiffs' version of the 1976 collective bargaining negotiations. While Kurt Friedman's testimony about and notes of those meetings may have differed in some details from the recollections of Plaintiffs' witnesses, neither his testimony nor his notes contradict Plaintiffs' central assertion that Dayton–Walther understood the provisions added to the pension agreement in 1976 as anything other than attempts to conform the agreement's language to the requirements of ERISA. Thus, taking the evidence presented at trial as a whole, the Court must conclude that Sections VI(1)(B), VIII and X were incorporated into the agreement with an intent to conform that agreement to ERISA's requirements and not in order to abrogate the guarantee of benefits set forth in Section XIII(1).[4]

Finally, the Court notes that negotiations in 1980, the negotiations which led to the

---

4. The Court notes that because it has found that the evidence shows that the Company's intent in 1976 was to conform the plan to the requirements of ERISA by the addition of Sections VI(1)(B), VIII and X rather than to abrogate the guarantee of benefits found in Section XIII(1), the Court need not reach the issue of whether Defendant is estopped from arguing that the language it proposed in 1976 was intended to abrogate Section XIII(1). Because the Court has not reached the estoppel argument, evidence of Robert Pryor's knowledge of whether the provisions proposed in 1976 were required by ERISA and the fact that the Plaintiffs' locals were on strike in 1976 is not relevant to the Court's considerations, since the Court need not determine whether the Plaintiffs reasonably relied to their detriment on Defendant's representations.

Pension Agreement effective on August 1, 1980, did not lead to the amendment of any section of the Agreement relative to the issue of whether the Company guaranteed payment of supplemental early retirement benefits, except that Section X's distribution of assets was spelled out in detail.

Accordingly, the Court must conclude that Section XIII(1) of the Pension Agreement requires that the company guarantee all benefits payable under that agreement above PBGC minimums, that Section VI(1)(B) of the Agreement merely provides a mechanism for payment of benefits in an ERISA type plan and that Sections VIII and X merely conform the agreement to ERISA type plan specifications. Therefore, the Court finds that failure of the Company to guarantee and to provide for continued payment of supplemental early retirement benefits to the Plaintiffs after termination of the plan was a breach of the pension agreement, and that judgment should be entered for the Plaintiffs and against the Defendant on Plaintiff's breach of collective bargaining agreement claim.

## B. BREACH OF FIDUCIARY DUTY UNDER ERISA

■■■ Having found that Defendant breached the Pension Agreement by failing to continue payment of supplemental early retirement benefits after termination of the Pension Plan, the Court must turn to Plaintiffs' claim that the Defendant's failure as Administrator of the Plan to seek to enforce the guarantee of Section XIII(1) against itself as employer of the Plaintiffs was a breach of its fiduciary duties under ERISA, 29 U.S.C. §§ 1104, 1132(a)(1)(B) & 1132(a)(3). Before reviewing this claim, the Court must clarify the distinction between claims under ERISA and under Section 301.

A claim under Section 301 is measured by whether the Collective Bargaining Agreement was breached. *See, e.g., International UAW v. Yard–Man*, 716 F.2d 1476, 1479 (6th Cir.1983). On the other hand, ERISA claims of breach of fiduciary duty are measured by whether the Defendant as Administrator of an ERISA type plan acted arbitrarily and capriciously. *See e.g., Cook v. Pension Plan for Salaried Employees*, 801 F.2d 865, 869–70 (6th Cir.1986). While these two standards of review may seem inconsistent, examination of the nature of each claim clarifies the reasons underlying the differences. In the Section 301 action, the Plaintiffs claim that Defendant as an employer has *contracted* to guarantee and to provide for continued payment of benefits if the assets of the plan prove insufficient to cover those benefits.. In the ERISA action, Plaintiffs claim that the Defendant acting as an Administrator of the pension plan *misconstrued* the requirements of the plan in determining that it, as plan Administrator, need not proceed against itself, as the employer of Plaintiffs, to gain payment of the supplemental early retirement benefits provided for in the plan. In other words, Defendant's duty with regard to the Section 301 claim arises out of its contracting with Plaintiffs' locals to guarantee and to provide for continued payment of benefits. Defendant's duty under Plaintiffs' ERISA claim arises under its statutory duties as a fiduciary to the plan.[5] Therefore, an arbitrary and capricious standard of review must be applied by the Court to determine whether the Defendant breached its duties under ERISA.

■■■ Reviewing the evidence presented at trial in this matter, the Court cannot find that Defendant has acted arbitrarily or ca-

---

**5.** An analogy to common law may clarify the difference between the duties imposed by Section 301 and those imposed by ERISA. In a common law setting, defendant's ERISA duties are analogous to the duties of a trustee in relationship to the beneficiaries of a trust. Defendant's duties under the pension agreement (the Section 301 claims) would be analogous to a trustee who has entered into an enforceable contract with a beneficiary of the trust to pay the beneficiary any difference between a set amount and the amount the trust actually paid.

If the beneficiary believed that the trustee was improperly administering the trust and as a consequence the trust payments were insufficient to that beneficiary, his or her recourse would be sue the trustee for a breach of his or her fiduciary duties under the trust agreement. However, if the beneficiary believed that the trustee had failed to live up to his or her contractual obligations to pay the difference between the set amount and the trust payments, the beneficiary would have to sue the trustee for breach of contract.

priciously in disregard of any duties imposed by ERISA. Plaintiffs at trial did show that the Defendant ignored the opinion of its enrolled actuary for the plan, David Kass, that Section XIII(1) required continued payment of supplemental early retirement benefits after termination of the plan. However, the whole of the evidence presented at trial demonstrates that the failure to follow the opinion of Mr. Kass standing alone does not constitute a violation of Defendant's fiduciary duties. As the Court has noted above, the 1980 Pension Agreement was ambiguous on its face. At trial, Defendant showed that it relied on other legal opinions to conclude that it was not required to pay supplemental early retirement benefits after termination of the plan. Accordingly, the Court must find that Defendant acting as Administrator of the plan did not act arbitrarily or capriciously in determining that it need not proceed against itself as the Plaintiffs' employer to recover the costs of supplemental early retirement benefits not covered by the plan assets. Judgment will therefore be entered for the Defendant and against the Plaintiffs on their ERISA claim.

## C. FORM OF RECOVERY

Having found Defendant liable to Plaintiffs for breach of the pension agreement, but not for breach of its fiduciary duties under ERISA, the Court must determine what remedy should be constructed to make Plaintiffs whole for their loss. Plaintiffs urge the Court to require Defendant to pay them a lump sum amount sufficient to cover the cost of past supplemental early retirement benefits not paid and an actuarily computed amount sufficient to cover future supplemental early retirement benefits. However, testimony elicited by the Defendant at trial indicated that payment of future supplemental early retirement benefits guaranteed by Section XIII(1) could be facilitated through other arrangements, such as inclusion of the Plaintiffs in

other existing pension plans for Dayton–Walther employees.[6]

■ As noted above, the Court found that Section XIII(1) constituted a guarantee by the Defendant that Plaintiffs would receive all supplemental early retirement benefits promised under the 1980 Pension Agreement. The Court did not find that this promise required the guarantee to take any particular form upon termination of the pension plan. Accordingly, the Court concludes that Defendant should be given the opportunity to perform its future obligations under the guarantee in as economical a manner as possible. Defendant, however, in light of the Court's finding that it has guaranteed continued payment of supplemental early retirement benefits, has the heavy burden of proving that any plan it submits as an alternative to a lump sum payment will completely guarantee Plaintiffs' future benefits. In other words, unless a plan is proposed by Defendant which the Court is convinced will assure payment of all future supplemental early retirement benefits to each member of the class of Plaintiffs, the Court will order that a lump sum payment be made. The Court will simply not risk the possibility of the Plaintiffs at some future time being deprived of benefits rightfully theirs. The Court will therefore order the Defendant, within twenty days from date of receipt of this Opinion, to file a plan for performance of its guarantees under Section XIII(1). Upon receipt of such a plan, the Court may, if it deems it necessary, appoint its own actuary to review said plan in order to determine whether it complies with the contractual guarantee.[7] Again, if the Court finds such a plan insufficient to guarantee Plaintiffs the future supplemental early retirement benefits promised under the 1980 Pension Agreement, it will reconsider its decision and order the payment of a lump sum to the Plaintiffs.

---

**6.** Supplemental early retirement benefits past due of course would have to be paid in lump sum form to the Plaintiffs. The only dispute in this case is whether future benefits would have to be paid to Plaintiffs in lump sum form.

**7.** The cost of such an actuary will be born by the Defendant.

With regard to early retirement benefits *past due,* the parties are directed to attempt to enter into a stipulation, within twenty days of receipt of this Opinion, as to the amount of such benefits for each Plaintiff as of the date of this entry. Should the parties fail to be able to agree to such a stipulation, the Court will appoint a Special Master to determine these amounts.

In sum, the Court finds for the Plaintiffs and against the Defendant on Plaintiffs' claim of breach of the 1980 Pension Agreement, but finds for the Defendant and against the Plaintiffs on Plaintiffs' ERISA claims. The Court declines, at this time, to order the Defendant to make a lump sum payment to Plaintiffs to cover the cost of future supplemental early retirement benefits.

## III. CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter of the captioned cause pursuant to 28 U.S.C. § 1331 in that Plaintiffs' claims arose under 29 U.S.C. §§ 185 and 1132.

2. The 1980 Pension Agreement was a valid, enforceable collective bargaining agreement within the meaning of 29 U.S.C. § 185.

3. The 1980 Pension Agreement is ambiguous on its face with respect to Plaintiffs' entitlement to supplemental early retirement benefits, since when that document is read as a whole two equally plausible, yet fundamentally inconsistent, interpretations of the Company's obligation to guarantee Plaintiffs' supplemental early retirement benefits can be formulated. In other words, the Agreement can be read either to construe § XIII(1) to constitute a Company guarantee of all benefits payable under the Agreement above PBGC minimums even after the termination of the term of the Pension Agreement *or* to construe §§ VI(1)(B), VIII and X as limiting Defendants' liability to PBGC minimums and the assets of the Pension Fund.

4. Review of the history of collective bargaining negotiations with respect to the material provisons of the Pension Agreement reveals that the parties intended § XIII(1) of the 1980 Pension Agreement to require the company to guarantee all benefits payable under the Agreement above PBGC minimums, § VI(1)(B) of the Agreement merely to provide a mechanism for payment of benefits in an ERISA-type plan, and §§ VIII and X merely to conform the Agreement to ERISA-type plan specifications. Accordingly, the Agreement requires Dayton Walther to guarantee continued payment of all supplemental early retirement benefits due Plaintiffs thereunder notwithstanding termination of the Pension Plan.

5. Defendant Dayton Walther's failure to pay Plaintiffs supplemental early retirement benefits upon the termination of the Pension Plan constitutes a breach, in violation of 29 U.S.C. § 185, of § XIII(1) of the collectively bargained for Pension Agreement, which requires that such benefits once payable be guaranteed by the assets of the Defendant.

6. Defendant Dayton Walther did not act arbitrarily or capriciously in failing to continue the payment of supplemental early retirement benefits upon termination of the Pension Plan in violation of 29 U.S.C. §§ 1104, 1132(a)(1)(B) & 1132(a)(3). In light of the ambiguity of the Pension Agreement, Dayton Walther's choice of a plausible interpretation of that Agreement fullfilled its fiduciary duties as Plan Administrator under ERISA.

Accordingly, based upon these Findings of Fact and Conclusions of Law, judgment will be entered for the Plaintiffs on their claim under 29 U.S.C. § 185, and for the Defendant on Plaintiffs' claim under 29 U.S.C. §§ 1104, 1132(a)(1)(B) & 1132(a)(3), as soon as the amounts of past due benefits owed to the individual Plaintiffs are determined and a suitable plan for the performance of Defendant's guarantees under § XIII(1) of the Pension Agreement with regard to future benefits is approved. Defendant is granted twenty days from receipt of this Opinion to file with the Court a plan to fullfill its guarantee obligations under §§ XIII(1) of the 1980 Pension Agreement. Plaintiffs and Defendant are also

granted twenty days from receipt of this Opinion to file stipulations as to the amount of benefits past due owed to the individual Plaintiffs or to notify the Court that no such stipulations can be reached.